# EXHIBIT A

PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA  92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
**09/28/2023** at 10:58:00 AM
Clerk of the Superior Court
By Shiela Retez,Deputy Clerk

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO

| | |
|---|---|
| MIGUEL ESPARZA, individually and on behalf of a class of similarly situated individuals,<br><br>    Plaintiffs,<br><br>    v.<br><br>KOHLS, INC., a Delaware corporation d/b/a KOHLS.COM,<br><br>    Defendants. | Case No. 37-2022-00051963-CU-CR-CTL<br>ASSIGNED FOR ALL PURPOSES TO THE HONORABLE RONALD F. FRAZIER, DEPT. C-65<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Complaint Filed:  December 29, 2022<br>Trial Date:  Not Assigned |

**INTRODUCTION**

**Defendant has secretly installed a collection of surveillance tools on its website at www.kohls.com to identify and "dox" every anonymous visitor and to wiretap and eavesdrop on all conversations conducted through the website chat feature. Defendant and its marketing partners then exploit their knowledge of visitors' identities, habits, and chat topics to bombard visitors with targeted marketing.**

**Defendant does all of this without visitors' effective informed consent. As a result, Defendant has violated numerous laws.**

**JURISDICTION AND VENUE**

1.      Defendant is subject to jurisdiction in this state under Penal Code Section 502(j), which provides that a person who causes, by any means, the access of a computer in California from another jurisdiction is deemed to have personally accessed the computer in California. Defendant is also subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure Section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."

2.      Venue is proper in this County in accordance with California Code of Civil Procedure Section 394(b) because "none of the defendants reside in the state." As such, venue is proper "in any county that the plaintiff may designate in his or her complaint."

**PARTIES**

3.      Plaintiff is a resident of California. While physically within California within the statute of limitations period, Plaintiff visited Defendant's Website and conducted a brief conversation with an agent of Defendant through the Website's chat feature. Plaintiff was not advised that the chat was monitored, intercepted, or recorded.

4.      Defendant is a Delaware corporation that sells clothing and other goods throughout the United States via its website and other distribution channels. Defendant owns, operates, and/or controls the above-referenced Website.

**FACTUAL ALLEGATIONS**

**A.  The Right to Privacy Has Always Been a Legally Protected Interest in the United States.**

5.      Since America's founding, privacy has been a legally protected interest at the local, state, and federal levels. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271–72 (9th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded 'as providing a basis for a lawsuit in English or American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) ("Violations of the right to privacy have long been actionable at common law.").

6.      More specifically, privacy protections against the disclosure of certain kinds of sensitive personal information are embedded in California statutes and at common law.  *See e.g.*, *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989) ("The Ninth Circuit has  repeatedly held that privacy intrusions may constitute "concrete injury" for purposes of Article III standing); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1041–43 (9th Cir. 2017) (finding "concrete injury" where plaintiffs claimed that unsolicited telemarketing calls "invade the privacy and disturb the solitude of their recipients*"); In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 599 (9th Cir. 2020) (finding "concrete injury" where Facebook allegedly tracked users' "personally identifiable browsing history" on third party websites); *Patel*, 932 F.3d at 1275 (finding "concrete injury" where plaintiffs claimed Facebook's facial-recognition technology violated users' privacy rights).

7.      In short, privacy is—and has always been—a legally protected interest in many contexts, including specifically with regard to sensitive personal information. Thus, a defendant whose acts or practices violate consumer privacy inflicts an actionable "injury" upon an individual.

**B.  The Right to Privacy Includes The Right To Online Anonymity.**

8.      The right to privacy includes the right to anonymity online.  *In Re Anonymous Online Speakers*, 661 F.3d 1168 (9th Cir. 2011).  Indeed, the "free exchange of ideas on the Internet is driven in large part by the ability of Internet users to communicate anonymously." *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088, 1093 (W.D. Wash. 2001).

9.      Consumer expectations regarding privacy reinforce the actionability of these rights. According to Pew Research Center nearly all Americans believe it is important to (1) be in control of

1  who can get information about their online activities; (2) to not be tracked online without their
2  consent; and (3) to be in control of what information is collected about them.

3      10.    Accordingly, most people don't want their private online browsing to be associated with
4  their public offline identities.  This is because online anonymity gives the freedom to investigate,
5  explore, and research without fear of social repercussions.  In addition, online anonymity helps prevent
6  security breaches, surveillance and intrusive web-tracking.

7  **C. The De-Anonymization of Internet Users Poses a Serious Threat to Personal Privacy and**
8      **the Internet.**

9      11.    In simple terms, de-anonymization is a process that involves cross-referencing
10  anonymized data with "commercially available information" ("CAI") obtained from grey data markets
11  to reveal an individual's identity.

12      12.    As the Director of National Intelligence explained in a January 22, 2022 report
13  (approved for public release on June 5, 2023) (the "DNI Report"), "the volume and sensitivity of CAI
14  have expanded in recent years mainly due to the advancement of digital technology, including
15  location-tracking and other features of smartphones and other electronic devices, and the advertising-
16  based monetization models that underlie many commercial offerings available on the Internet."

17      13.    The Director of National Intelligence concluded (1) that the existence of these practices
18  poses a threat to national security since it is available to foreign governments since it "clearly provides
19  intelligence value," and (2) that it "raises significant issues related to privacy and civil liberties."

20      14.    The Director of National Intelligence concluded that the "single most important point"
21  is that the expansion of CAI is "increasingly powerful for intelligence and increasingly sensitive for
22  individual privacy and civil liberties" such that the Intelligence Community "needs to develop more
23  refined policies to govern its acquisition and treatment."

24  **D. Defendant Uses "Identity Resolution" Tools to Access Every Visitor's Device, Reveal**
25      **Their Identities, and Publicize Their Personal Information to Its Marketing Partners.**

26      15.    As noted above, internet users have the right to remain anonymous.  Nevertheless, some
27  companies sell website owners "identity resolution" malware tools to de-anonymize and track website
28  visitors.  Identity resolution is generally defined as "the ability to recognize an individual person, in

real-time, by connecting various identifiers from their digital interactions across devices and touchpoints." *See* https://www.fullcontact.com/identity-resolution/ (last downloaded September 2023).

16. Identity resolution requires the collection of "technical markers" and other clues that digital visitors leave when they use the internet, even though most users "are trying to reveal as little information as possible." *See* https://venturebeat.com/ai/what-is-identity-resolution-its-benefits-challenges-and-best-practices/ (last downloaded September 2023). Those "technical markers" include routing information, locally stored data (sometimes called "cookies"), and idiosyncratic behavior of computers. The techniques have grown much more sophisticated over the years, and modern identity resolution algorithms rely upon dozens of types of details and digital footprints. *Id.*

17. In short, identity resolution providers aggregate visitor "touchpoints" containing anonymous identifiers to find links between the anonymous identifiers until the data compiled into a dossier about an anonymous individual can be linked to a specific individual by name, age, address, physical location, and more.

18. The following visual depiction shows an example of how identity resolution providers aggregate dozens of "touchpoints" to identify an anonymous internet user:



19.     In the above example, the identity resolution provider has aggregated and analyzed dozens of anonymous "touchpoints" to reveal the following about a previously anonymous internet user, Mary Smith:

(a) Full name (*Mary Smith*)

(b) Date of birth (*May 1, 1979*)

(c) Gender (*female*)

(d) Home address (*2345 Avenue C, Papillion Nebraska*)

(e) Marital Status and Family (*Married with two children*)

(f) E-mail address (*Mary.Smith@gmail.com*)

(g) Personal Cell Phone: *(111) 123-4567*

(h) Voter Registration Status (*Registered*)

(i) Interests (*Shopping, Cooking, Traveling, Reading, Science*)

(j) Employer (*Karen's Fireside, Inc.*)

(k) Title (*Vice President*)

(l) Work Hours (*Daily 9-5*)

20.     To identify and "dox" each visitor, Defendant has deployed the following malware tools on its website:

a. ***LiveRamp***: LiveRamp's Identity Resolution software secretly installs a "persistent cookie" on every user's device to identify anonymous "by connecting billions of touch points, such as emails, devices, and purchases." *See* https://liveramp.com/why-foundational-identity/ (last downloaded September 2023).

b. ***RapLeaf by ATData:*** Rapleaf's "Identity Matching" software de-anonymizes website visitors by "building a complete picture of your customers across channels with AtData's proprietary technology and data assets, including more than 1 billion unique customer records." *See* https://www.atdata.com/identity (last downloaded September 2023).

21.     Within the statute of limitations period, Plaintiff visited Defendant's website and communicated with Defendant via Defendant's chat feature.  As a result of Defendant's use of identity

1   resolution malware and intrusion onto Plaintiff's device, Defendant obtained plaintiff's personal

2   information and embedded Plaintiff's identity into the malware companies' extensive "gray market

3   CAI" database, which the malware companies share virally with other companies that purchase their

4   products.

5        22.      As a result of Defendant's wrongful conduct: (1) Plaintiff has been de-anonymized and

6   Plaintiff's personal information has been added to an extensive malware database; (2) Plaintiff has

7   been bombarded with targeted advertising, e-mails, and telephone calls; (3) Plaintiff can no longer surf

8   the web anonymously; and (4) Plaintiff has been exposed to heightened risk of identity theft.

9        23.      In short, Defendant has deprived Plaintiff of numerous important privacy rights

10  protected under California common law and statutes.  Defendant's conduct amounts to "doxing by

11  deanonymization" and robs Plaintiff of anonymity and obscurity.  As a result, it is now easier for other

12  companies to obtain other types of identity knowledge about Plaintiff and subject Plaintiff to further

13  doxing.  *See* *Doxing: A Conceptual Analysis, Ethics and Information Technology* (Volume 18, pages

14  199–210 (2016).

15       **E.  Defendant's Further Violation of California Invasion of Privacy Act.**

16       24.      In addition to de-anonymizing and doxing class members, Defendant also allows a

17  company to wiretap and eavesdrop upon class member communications through the website chat

18  feature in violation of California law.

19       25.      CIPA prohibits both wiretapping and eavesdropping of electronic communications

20  without the consent of all parties to the communication.  "'[T]he right to control the nature and extent

21  of the firsthand dissemination of [one's] statements'" is viewed by the California Supreme Court "as

22  critical to the purposes of Section 631[.]"  *Javier v. Assurance IQ, LLC*, 2023 WL 114225, at *6 (N.D.

23  Cal. Jan. 5, 2023) (Breyer, J.) (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985)); *Ribas*, 38 Cal. 3d

24  at 360-61 ("a substantial distinction has been recognized between the secondhand repetition of the

25  contents of a conversation and its simultaneous dissemination to an unannounced second auditor,

26  whether that auditor be a person or mechanical device").  "[U]nder Section 631, it has always mattered

27  who is holding the tape recorder[.]"  *Javier*, 2023 WL 114225, at *6.  Compliance with CIPA is easy,

28

and most website operators comply by conspicuously warning visitors if their conversations are being recorded, intercepted, or eavesdropped upon.

26.     Unlike most companies, Defendant *ignores* CIPA.  Instead, Defendant enables and allows the third parties to eavesdrop on all such conversations.  Why?  Because, as one industry expert notes, "*Live chat transcripts are the gold mines of customer service.  At your fingertips, you have valuable customer insight to make informed business decisions. . . .***When people are chatting, you have direct access to their exact pain points.***"*).  *See* https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts (last visited July 2023) (emphasis added).

27.     To enable the eavesdropping, Defendant allowed a company named Ada Support Inc. (hereinafter, "ASI") to embed its chat technology code into the chat feature offered on Defendant's Website.  Indeed, whenever a consumer chats via Defendant's Website, the chat is routed through ASI's servers so they may simultaneously collect a transcript of that chat, along with other user data, in real time and save it for later access.

28.     ASI's product is a type of automatic routing software that automatically acquires and transmits user chat communications to ASI without any active input from either Defendant's employees, agents, or human representatives.  ASI acquires Website visitors' chat communications by first having its software route them to ASI's own computer servers that it owns, controls, and maintains.  The secret code enables and allows ASI to secretly intercept in real time, eavesdrop upon, and store transcripts of consumers' chat communications they think they are having with Defendant, even when such conversations are private and contain personally identifiable information ("PII") – as Plaintiff's did.  Defendant neither informs visitors of this conduct nor obtains their consent to these intrusions.

29.     Indeed, ASI admits that it collects and stores chat transcripts.  See https://docs.ada.cx/en/integrate-ada-with-other-tools/attach-chat-summaries-to-handoff-transcripts.html (last downloaded September 2023).  One might reasonably wonder why ASI would be interested in intercepting and recording the Website chat interactions between Defendant and unsuspecting visitors to Defendant's Website.  As shown below, it all about money.

30.     ASI is integrated with social media platforms like Meta and its subsidiaries, Facebook

and Kustomer.  See https://apps.ada.cx/ ("Move from AI to live chat with an agent in Kustomer, directly in the Ada chat. . . Automate customer interactions in Facebook Messenger for a consistent brand experience.") (last visited September 2023).  Integration allows various software sub-systems to share data to operate as a unified system.  According to Bloomberg.com, this is all part of Meta's secret "***plan to profit from private chats.***"  As Bloomberg explained, Meta's software integration "*can manage customer messages from multiple services on one central dashboard. That's central to Meta's plan to make money off of its two messaging apps, WhatsApp and Messenger.*" *See* https://www.bloomberg.com/news/articles/2022-02-15/meta-closes-1-billion-kustomer-deal-after-regulatory-review (last downloaded September 2023).

31.     So how does it work?  ***First***, Meta identifies "user interests" by monitoring a collection of "offsite" user activity such as website visits and interactions (including private chat communications between Defendant and visitors) by "integrating" its software with ASI and the Identity Resolution Malware Companies identified above.  ***Second***, Meta and the Identity Resolution Malware Companies generate revenue based on their ability to identify anonymous internet users, along with their habits, preferences, and interests.  ***Third and finally***, after the chat transcripts intercepted by ASI are provided to Meta and the Third Party Identity Resolution Malware Companies, visitors are bombarded with targeted advertising, e-mails, and telephone calls.

32.     Through the preceding acts, Meta's boasts that it will "Transform your support center into a profit generator by bulk messaging specific customer segments based on your unique data…to reengage dissatisfied customers."  *See* https://www.kustomer.com/product/customer-service/ (last downloaded September 2023( (link preserved but since disabled).

33.     ASI does more than merely provide a storage function for Defendant regarding Website users' chat communications with Defendant. As shown above, ASI uses its record of Website users' interaction with Defendant's chat feature to enable targeted marketing by Defendant and the Identity Resolution Malware Companies.

34.     Indeed, all of the schemers – Defendant, ASI, Meta, and the Identity Resolution Malware Companies – all profit from secretly exploiting their ability to identify anonymous individuals who have visited Defendant's website.  How?  Because "*Targeted advertising allows*

*brands to send different messaging to different consumers based on what the brand knows about the customer. The better a brand can demonstrate that it understands what its customers want and need, the more likely customers respond to advertising and engage with the brand. . . .Social media targeting helps brands leverage consumers' behavior on the web, search engines, and social media sites to present ads that reflect consumer interests.*"[1]

35.     Plaintiff's conversations through the website chat feature was transmitted from "cellular radio telephony" as defined by CIPA.  By definition, Defendant's chat communications from its Website are transmitted to website visitors by either cellular telephony or landline telephony.  *See* https://www.britannica.com/technology/Internet ("How does the Internet work?") ("*The Internet works through a series of networks that connect devices around the world through telephone lines.*") (last visited September 2023) (emphasis added).

36.     Defendant did not inform Class members that Defendant was secretly allowing, aiding, and abetting ASI to intercept and eavesdrop on the conversations during transmission, or that ASI provided data from such transcripts to Meta and the malware companies through "integration" with Meta software.

37.     Defendant did not obtain class members' effective consent for the preceding intrusions, nor were class members aware of Defendant's conduct.

## **CLASS ALLEGATIONS**

38.     Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons within the state of California who within the statute of limitations period: (1) visited Defendant's website; and (2) were exposed to the wrongful conduct described above.**

39.     <u>NUMEROSITY</u>: Plaintiff does not know the number of Class members but believes the number to be at least 50 but not more than 100. The exact identities of Class members may be ascertained by the records maintained by Defendant.

---

[1] *See* https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Targeted%20advertising%20allows%20brands%20to,and%20engage%20with%20the%20brand (last September 2023).

**FIRST AMENDED CLASS ACTION COMPLAINT**

40.    <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class members, and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a.    Whether Defendant engaged in the wrongful conduct described above;

b.    Whether Plaintiff and Class members are entitled to statutory penalties; and

c.    Whether Class members are entitled to injunctive relief.

41.    <u>TYPICALITY</u>: As a person who visited Defendant's Website, whose privacy was invaded and whose electronic communication was recorded, intercepted and eavesdropped upon, Plaintiff is asserting claims that are typical of the Class.

42.    <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

43.    <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient.  Even if every Class member could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## **FIRST CAUSE OF ACTION**

### **Violations of the California Invasion of Privacy Act**

### **Cal. Penal Code § 631(a)**

44.    "Any person who, by means of any machine, instrument, or contrivance, or in any other manner, [i] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [ii] who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or

communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine . . . ." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1080 (C.D. Cal. 2021) (Holcomb, J.) (line breaks and headings of clauses added for ease of reference) (quoting Cal. Penal Code § 631(a)).

45.     Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications with Defendant's Website.  "Though written in terms of wiretapping, Section 631(a) applies to Internet communications.  It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.'" *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022); *Yoon*, 549 F. Supp. 3d at 1080 ("Courts agree … that CIPA § 631 applies to communications conducted over the internet.") (citing *Matera v. Google Inc.*, 2016 WL 8200619, at *18 (N.D. Cal. Aug. 12, 2016) (Koh, J.) (holding that second clause of section 631(a) "encompasses email communications, which pass over wires, lines, or cables")); *In re Google Inc. Gmail Litig.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013) (Koh, J.) ("the Court finds that section 631 of CIPA applies to emails"); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 826 (N.D. Cal. 2020) (Labson Freeman, J.).

46.     The software embedded on Defendant's Website to record and eavesdrop upon the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein.  *See In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 937 (N.D. Cal. 2015) (stating that "***it is undeniable that a computer may qualify as a 'machine'***" within the meaning of section 631(a)) (emphasis added), *aff'd in part and rev'd in part on other grounds*, 956 F.3d 589 (9th Cir. 2020).

47.     At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class Members with Defendant's Website to be recorded.  Defendant also aided

1    and abetted, agreed with, employed, or conspired with ASI to wiretap and/or eavesdrop upon such

2    conversations during transmission and in real time by voluntarily embedding the software code.

3        48.    Defendant knows that ASI captures the electronic communications of visitors to

4    Defendant's Website, and pays ASI to conduct these activities.

5        49.    Plaintiff and Class Members did not expressly or impliedly consent to any of

6    Defendant's actions.

7        50.    In numerous materially identical cases, courts have held that the above-described

8    allegations state viable claims for violations of section 631(a) of CIPA.  *See Byars v. The Goodyear*

9    *Tire & Rubber Co.*, No. 5:22-cv-01358-SSS-KKx, 2023 WL 1788553, at *4 (C.D. Cal. Feb. 3, 2023)

10   (Sykes, J.) ("*Byars contends that Goodyear, using a third-party service, "intercepts in real time" a*

11   *website visitors' chat conversation. . . . Byars alleges that, using the chat conversation, website*

12   *visitors share sensitive personal information. . . . . Because Byars has pled sufficient facts to show the*

13   *contents of the communications and that the communications were intercepted, Byars has sufficiently*

14   *stated a claim under § 631(a).*"); *Valenzuela v. Nationwide Ins.*, No. 2:22-cv-06177-MEMF-SK, - F.

15   Supp. 3d -, 2023 WL 5266033 (C.D. Cal. Aug. 14, 2023) (Frimpong, J.) (denying Motion to Dismiss);

16   *Licea v. Jockey International*, L.A.S.C. Case. No. 23STCV02906 (order overruling Demurrer dated

17   August 11, 2023); *Licea v. Men's Wearhouse*, L.A.S.C. Case No. 23STCV02964 (order overruling

18   Demurrer dated July 24, 2023); and *Licea v. MalwareBytes, Inc.*, San Bern. Sup. Ct. Case No. 22-

19   24245 (order overruling Demurrer dated July 19, 2023).

20       51.    Defendant's conduct constitutes numerous discrete violations of Cal. Penal Code §

21   631(a), entitling Plaintiff and/or Class Members to injunctive relief and statutory damages.

## SECOND CAUSE OF ACTION

### CALIFORNIA UNAUTHORIZED ACCESS TO COMPUTER DATA ACT

### PENAL CODE SECTION 502

25       52.    The California Unauthorized Access to Computer Data Act (the "CUCA") makes it

26   unlawful for parties to obtain data from a computer user outside of the scope of the user's

27   authorization.

28

EXHIBIT 3
13
FIRST AMENDED CLASS ACTION COMPLAINT
PAGE 21

53.     Specifically, Penal Code Section 502(c) imposes liability on any entity that "knowingly accesses and without permission" (1) uses any computer data, in order to "wrongfully control or obtain" computer data, or (2) "makes use of any data from a computer…"

54.     CUCA provides a private right of action for compensatory damages, punitive damages, and attorneys' fees to any individual harmed by its violation.  *See Facebook, Inc. v. Power Ventures, Inc.*, 2012 WL 542586 (N.D. Cal. Feb. 16, 2012).

55.     By knowingly installing the Identity Resolution Malware to access class member devices and extract their personal information, Defendant violated CUCA.  *See United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2015) (violation of CUCA to access a device and use data improperly); and *Gilbert v. City of Sunnyvale* (2005) 130 Cal. App. 4th 1264, 1281 (accessing and without permission making use of any data from a computer system) violates CUCA.

## THIRD CAUSE OF ACTION

## CALIFORNIA INVASION OF PRIVACY

56.     Article I, § 1 of the California Constitution provides, "All people are by nature free and independent and have inalienable rights. Among those are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

57.     The phrase "and privacy" was added by an initiative adopted by California voters on November 7, 1972 (the Privacy Initiative). The Privacy Initiative created a private right of action against nongovernmental entities for invasions of privacy.

58.     The California Supreme Court has explained that one of the principal "mischiefs" to which the Privacy Initiative was directed was "the overbroad collection and retention of unnecessary personal information by government and business interests." *White v. Davis*, 13 Cal.3d 757, 775 (Cal. 1975).

59.     Defendant's conduct in secretly accessing class member devices, gathering highly personal details about them and their browsing history, and sharing that information with malware companies amounts to doxing and violates class members' rights to privacy.

60.     Defendant assisted the malware companies to create etailed dossiers of class members and then share it with and sell it to numerous other companies.

61.     Class members have the right to privacy in their web-browsing history; in how personal information is going to be used; in the right to withhold and not disclose personal information; and all statutory privacy rights codified under federal and California law.

62.     Defendant has intruded on these privacy interests.

63.     Defendant's actions constitute a serious invasion of privacy in that they violate several state laws; disclosed sensitive personal information to third parties; and facilitated the disclosure of class member information by third parties who did not have legal access to their personal information.

64.     Defendant acted with oppression, fraud, or malice.

65.     Class members have been damaged by Defendant's invasion of privacy and are entitled to just compensation in the form of actual and punitive damages.

## FOURTH CAUSE OF ACTION

### INTRUSION UPON SECLUSION

66.     A claim for intrusion upon seclusion requires (1) intrusion into a private place, conversation, or matter; and (2) in a manner highly offensive to a reasonable person.

67.     Defendant intentionally intruded upon class members' solitude and seclusion by (1) secretly accessing their devices to install identity resolution malware without their knowledge or permission; and (2) mining their personal data and sharing it with malware companies.

68.     As set forth above, the right to online privacy is both actionable and expected by consumers.  As such, Defendant's brazen de-anonymization of class members was highly offensive to all reasonable persons.

69.     None of Defendant's actions were authorized.

70.     Defendant violated state criminal and civil laws designed to protect individual privacy and against theft.

71.     Defendant has acted with oppression, fraud, or malice.

72.     Class members are entitled to just compensation in the form of actual damages and punitive damages under this cause of action.

1

## **PRAYER FOR RELIEF**

2

WHEREFORE, Plaintiff prays for the following relief against Defendant:

3

1.    An order certifying the Class, naming Plaintiff as the representative of the Class and

4

Plaintiff's attorneys as Class counsel;

5

2.    An order declaring Defendant's conduct violates the above-referenced laws;

6

3.    All relief at law or equity that may be proper.

7

Dated:  September 28, 2023                         PACIFIC TRIAL ATTORNEYS, APC

8

9

By:_____

10

Scott. J. Ferrell
Attorneys for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 4100 Newport Place Drive, Suite 800, Newport Beach, CA 92660.

On September 28, 2023, I served the foregoing document described as **FIRST AMENDED CLASS ACTION COMPLAINT** on the following person(s) in the manner indicated:

**SEE ATTACHED SERVICE LIST**

☐      (BY MAIL)  I am familiar with the practice of Pacific Trial Attorneys for collection and processing of correspondence for mailing with the United States Postal Service.  Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.  On this date, a copy of said document was placed in a sealed envelope, with postage fully prepaid, addressed as set forth herein, and such envelope was placed for collection and mailing at Pacific Trial Attorneys, Newport Beach, California, following ordinary business practices.

☐      (BY OVERNIGHT FEDERAL EXPRESS)  I am familiar with the practice of Pacific Trial Attorneys for collection and processing of correspondence for delivery by overnight courier. Correspondence so collected and processed is deposited in a box or other facility regularly maintained by Federal Express that same day in the ordinary course of business. On this date, a copy of said document was placed in a sealed envelope designated by Federal Express with delivery fees paid or provided for, addressed as set forth herein, and such envelope was placed for delivery by Federal Express at Pacific Trial Attorneys, Newport Beach, California, following ordinary business practices.

☐      (BY HAND DELIVERY)  I am familiar with the practice of Pacific Trial Attorneys for collection and processing of correspondence for hand delivery by courier.  I caused such document t be delivered by hand to the addresse(s) designated.

☐      (BY      ELECTRONIC      SERVICE)      My      electronic      service      address      is _____@pacifictrialattorneys.com.   I am electronically serving the document described above and a copy of this declaration to the person, on the date shown below, to the email addresses of the persons listed in the attached service list.

☒      (BY ELECTRONIC SERVICE via USA Legal) I am electronically serving the document described above and a copy of this declaration to the person, on the date shown below, to the email addresses of the persons listed in the attached service list.  I am readily familiar with the business' practice for filing electronically, and that the document would be electronically served the same day in the ordinary course of business following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on September 28, 2023, at Newport Beach, California.

_____
Mandy K. Jung

17
PROOF OF SERVICE

EXHIBIT A
PAGE 25

**SERVICE LIST**

| | |
|---|---|
| Becca J. Wahlquist | Attorneys for Defendant |
| Victor Sandoval | KOHL'S, INC. |
| **KELLEY DRYE & WARREN LLP** | |
| 350 South Grand Avenue, Suite 3800 | |
| Los Angeles, CA 90071 | |
| Telephone: (213) 547-4900 | |
| Facsimile: (213) 547-4901 | |
| bwahlquist@kelleydrye.com | |
| vsandoval@kelleydrye.com | |

- 18 -

EXHIBIT A
PAGE 26